J. B. Book, Jr. v. Commissioner.
J. B. Book v. Commissioner
Docket No. 15314.
United States Tax Court
1949 Tax Ct. Memo LEXIS 278; 8 T.C.M. (CCH) 101; T.C.M. (RIA) 49020; January 31, 1949
*278 Petitioner, a trustee and a remainderman of a testamentary trust estate, in 1941 paid the sum of $70,000 in discharge of his personal guaranty of the payment of certain notes issued by the trust estate under a mortgage agreement on which a default arose. In 1942 and 1943 petitioner made additional payments on account of such guaranty. Held: 1. The loss sustained in 1941 resulted from a transaction entered into for profit and did not constitute a deduction attributable to the operation of a business regularly carried on by petitioner. The loss which can be carried over as a net operating loss is limited to the extent provided in section 122 (d) (5) of the Internal Revenue Code. The payments made in 1942 and 1943 on account of such guaranty are likewise sustained in a transaction entered into for profit and are deductible in full under section 23 (e) (2) of the Internal Revenue Code. Ralph W. Barbier, Esq., Penobscot Bldg., Detroit, Mich., for the petitioner. Wesley A. Dierberger, Esq., for the respondent. LEECH
Memorandum Findings of Fact and Opinion LEECH, Judge: This proceeding involves a deficiency in income and victory tax for the calendar year 1943 in the amount of $4,158.79. The issues involved are: (1) Whether petitioner is entitled to a net operating loss carry-over from the year 1941 to the years 1942 and 1943; and (2) Whether the respondent erred in allowing petitioner a deduction of the amount of $3,895.59 in 1942 and the sum of $1,000 in 1943 as bad debts rather than as business losses. Findings of Fact Petitioner is an individual residing at *280 8469 East Jefferson Avenue, Detroit, Michigan. His income tax return for the period involved was filed on a cash basis with the collector of internal revenue for the district of Michigan, at Detroit, Michigan. Petitioner is a grandson of Francis Palms, who died testate about 1886. Under the latter's will, one half of his estate went to his son and his issue and the other one half went in trust to his daughter, Clotilde Palms, and her issue, petitioner and his two brothers (designated herein as the "Book Family Testamentary Trust"). Later the interest of the son of Francis Palms was distributed prior to the period here in question. Under the terms of the Book Family Testamentary Trust, the mother, Clotilde Palms Book, was the life beneficiary, and her three sons, Frank Book, Herbert Book, and the petitioner, were the sole remaindermen, each having a one-third interest. In 1926, the corpus of this trust comprised a large number of properties, including various buildings of two, three and four stories, wholesale and retail stores, a large apartment building known as the Palms Apartment, the Book Building, and the Book Tower, office buildings, all located in the City of Detroit, Michigan, *281 which were developed and operated, and some of them, such as the Book Building and the Book Tower, constructed by this trust. In 1926 the trustees of the Book Family Testamentary Trust, to wit: Clotilde Palms Book, Frank Book and petitioner, borrowed the sum of $1,700,000 under a trust mortgage agreement, and pledged the trust real estate to secure that indebtedness. In addition, petitioner and his two brothers, Frank and Herbert, the remaindermen, executed a guaranty, jointly and severally, guarantying the payment of the principal and interest of the notes issued under that trust mortgage. The funds borrowed were used to discharge an accumulated indebtedness of the Book Family Testamentary Trust and to supply additional funds which were loaned to the Book Estate and again in turn loaned to the Developments Corporation. The Book Estate was a voluntary trust created on December 29, 1916 by petitioner and his two brothers, who were its trustees and sole beneficiaries. The original corpus of this trust, which came from the father of petitioner, consisted of a large number of shares of stock which were later sold and the proceeds used in various real estate developments. The Developments *282 Corporation was formed in 1916 or 1917 and its stock was owned by the Book Estate and the Book Family Testamentary Trust set up under the will of Francis Palms. The Developments Corporation built the Book-Cadillac Hotel. In 1926, following the execution of the above-mentioned loan and guaranty, Clotilde Palms Book died and the other brother of petitioner, Herbert, was substituted as trustee. The Book Family Testamentary Trust was thereafter continued as a voluntary trust. Petitioner had individually constructed the Washington Boulevard Building, Book Tower Arcade and the Book Tower Garage. In 1926, these buildings were transferred to the J. B. Book Corporation, which operated them. The petitioner was sole stockholder and president of that corporation. The Book Family Testamentary Trust, after completion of the Book Building, about 1917 or 1918 organized a corporation known as the Book Building Inc., which took over the operation of the Book Building. All of the capital stock of such corporation was owned by the Book Family Testamentary Trust. Sometime after 1927, the Book Family Testamentary Trust defaulted on its bond indebtedness. The mortgage was foreclosed and all of the *283 assets taken over by corporations organized by the noteholders. The personal guaranty of petitioner and his brothers then became a part of the assets of the F.P.E. Noteholders Corporation, one of such corporations. It brought suit against petitioner and his brothers on that guaranty. Thereafter petitioner and his brothers entered into an agreement of settlement with the F.P.E. Noteholders Corporation on the basis of the payment of $400,000. Petitioner, in 1941 transferred to the F.P.E. Noteholders Corporation 300 shares of the capital stock of the Washington Boulevard Building, Inc., owned by him individually, which had a fair market value of $70,000. The F.P.E. Noteholders Corporation accepted the stock at $70,000 and credited that amount on the agreement of settlement. In 1942 petitioner made an additional payment of $750, and a further payment of $1,000 in cash in 1943, under the aforesaid settlement agreement. Prior to 1941 the Book Family Testamentary Trust had lost all of its assets through foreclosure and had ceased to exist. For the year 1941, petitioner and his wife filed a joint income tax return. On this joint return petitioner reported his basis for the 300 shares of *284 Washington Boulevard Building, Inc., to be $150,302.49. Petitioner took a capital loss on that transaction of $80,302.49 and a bad debt deduction of $70,000. A net loss of $79,917.91 was shown on this return. The items of gross income belonging to petitioner aggregated $20,417.17; deductions, exclusive of capital losses and the $70,000 bad debt deduction, aggregated $1,230.06, so that the net loss attributable to petitioner is the sum of $50,812.89. For 1942, petitioner filed an individual income tax return. In that return petitioner reported in Schedule H his business as being "Real Estate Development", and showed an income of $295.16 and losses of $4,190.75, being composed of legal expenses in the amount of $3,440.75 in connection with the suit to enforce his personal guaranty, and an additional cash payment of $750 made on such guaranty. The activity of petitioner which produced his income in 1942 was acting as an officer of various corporations from which he received a salary of $13,200. A net operating loss carry-over from the year 1941 in the amount of $50,812.89 was claimed as a deduction. A net loss is shown on the return in the amount of $41,013.02. For 1943, petitioner *285 filed an individual income and victory tax return. In that return, in Schedule C, petitioner stated his business was "Real Estate Development" and showed a loss of $1,000 as being a payment on account of his aforesaid personal guaranty. The activity of petitioner which produced his income in the taxable year 1943 was acting as an officer of various corporations from which he received compensation in the sum of $15,805. A net operating loss carry-over in the sum of $41,013.02 was claimed as a deduction. The net loss shown on that return is $27,859.58. In determining the contested deficiency, the respondent adjusted petitioner's net income for 1942 by the disallowance of the deduction of $50,812.89 as a net operating loss carry-over from the year 1941, and allowed the amount of $3,895.59, claimed by petitioner as a business loss, as a bad debt that became worthless in 1942. In the taxable year 1943, the respondent disallowed the amount of $41,013.02, representing the balance of the net operating loss carry-over from the year 1941. The $1,000 payment was disallowed as a business loss, but allowed as a nonbusiness debt and treated as a short-term capital loss. Prior to 1926 and for *286 a number of years thereafter, petitioner was engaged in carrying on a real estate business on his own account. The business activity of petitioner in the years 1940 to 1943, inclusive, was acting as an officer of corporations engaged in the real estate business. Opinion The primary question presented is whether petitioner is entitled to a net operating loss carry-over from the year 1941 to the years 1942 and 1943, under section 122 of the Internal Revenue Code. In 1941, petitioner, on a cash basis, paid the sum of $70,000 in discharge of his liability resulting from his personal guaranty of the payment of notes issued pursuant to a trust mortgage executed by the Book Family Testamentary Trust of which he was one of the trustees. On a joint income tax return of petitioner and his wife for the year 1941, the sum of $70,000 was claimed as a bad debt deduction resulting in a net loss for that year attributable to petitioner in the sum of $50,812.89. On his individual income tax return for the year 1942, petitioner claimed the amount of $50,812.89 as a net operating loss carry-over from 1941, and on his individual income tax return for the taxable year 1943 he *287 claimed as a deduction the sum of $41,013.02, as the unabsorbed portion of the net operating loss carry-over from the year 1941. The position of the respondent is that the petitioner had no deductible loss in 1941, but if he had such loss it is not one attributable to a trade or business regularly carried on and is, therefore, subject to the limitations of section 122 (d) (5) of the Internal Revenue Code. In 1926 petitioner, his brother Frank and Clotilde Palms Book were the trustees of the Book Family Testamentary Trust. Clotilde Palms Book, who was a daughter of the testator and mother of petitioner, was a life beneficiary of the trust, and petitioner and his two brothers were the sole remaindermen. The Book Family Testamentary Trust had very extensive real estate holdings. It erected a number of buildings of various sizes and used for various purposes. In 1926 the above-mentioned trustees of such trust borrowed the sum of $1,700,000 under a written trust mortgage agreement by which the real estate was pledged as security. Petitioner and his two brothers at the same time executed a separate agreement whereby they jointly and severally guaranteed the payment *288 of the principal and interest of the notes issued pursuant to such trust mortgage. Later the mortgage went into default and was foreclosed. The assets of such trust were taken over by corporations organized by the noteholders. One of the corporations, known as the F.P.E. Note-holders Corporation, acquired the personal guaranty of petitioner and his brothers. Later suit was brought to enforce the guaranty, and a compromise agreement of settlement resulted. In satisfaction of his individual liability, petitioner in 1941 transferred to F.P.E. Noteholders Corporation 300 shares of the capital stock of the Washington Boulevard Building, Inc., having a market value of $70,000. We think, under such circumstances, there can be no doubt that petitioner in that year sustained a loss to the extent of $70,000. Since the principal debtor, the Trust Estate, had no assets and had ceased to exist prior to the time the petitioner made the $70,000 payment, the claim for a deduction as a bad debt was not well taken. Abraham Greenspon, 8 T.C. 431, 434; cf. Frank B. Ingersoll, 7 T.C. 34. While in 1926 petitioner was individually carrying on a real estate business, the guaranty *289 which he executed was not an incident of his individual business. The personal guaranty was issued in connection with the real estate business then being carried on by the Book Family Testamentary Trust through its trustees acting in their fiduciary capacity. Undoubtedly petitioner was required to and did consent to personally guarantee the notes issued under the trust mortgage agreement because he was a remainderman of the corpus of such trust. Under the circumstances the use of the borrowed funds would enhance his beneficial interest in the trust corpus. Hence, the giving of his personal guaranty was a transaction"entered into for profit" and the loss resulting therefrom constitutes a deductible item under section 23 (e) (2) of the Code. Abraham Greenspon, supra; Marjorie Fleming Lloyd-Smith, 40 B.T.A. 214. However, the fact that petitioner in 1941 sustained a deductible loss does not necessarily give rise to a net operating loss carry-over. Section 122 of the Code defines net operating losses and prescribes the extent of their availability as a carry-over to subsequent years. Deductions otherwise allowed by law not attributable to the operation of a business regularly *290 carried on can be carried over only to the extent provided in subdivision (d) (5) of said section 122. Petitioner's loss sustained in 1941 resulted solely from his personal guaranty. It is clear from this record that petitioner was not at any time engaged in the business of guarantying loans. Therefore, the loss in question resulted from an isolated transaction not connected with any business he was regularly carrying on. It has been repeatedly held that a deduction not attributable to the operation of a trade or business regularly carried on, for the purposes of a net operating loss carry-over is limited by subdivision 122 (d) (5) to the amount of the gross income not derived from a trade or business. Lazier v. United States et al., 170 Fed. (2d) 521 (November 10, 1948); Joseph L. Merrill, 9 T.C. 291 (on appeal to C.C.A. 2); Joseph Sic, 10 T.C. 1096 (on appeal to C.C.A. 8); Hartwig N. Baruch, 11 T.C. 96. We sustain the respondent with respect to this issue. There remains for disposition the proper treatment to be accorded to other deductions claimed by petitioner in the years 1942 and 1943. On his individual income tax return *291 for 1942, petitioner claimed a net deduction of $3,895.59 as a business loss, consisting of a payment of $750 made in 1942 on account of the same personal guaranty and the payment of $3,440.75 for attorneys' fees in connection with the litigation to enforce said personal guaranty, less the amount of $295.16 returned as income from petitioner's real estate operations. The respondent allowed the net amount of $3,895.59 as a bad debt deduction. On his 1943 individual income tax return, petitioner claimed a deduction of the sum of $1,000, constituting a payment on account of his personal guaranty, as a business loss. The respondent allowed a deduction of the sum of $1,000 as a nonbusiness bad debt and treated it as a loss from the sale or exchange of a capital asset held for not more than six months, under section 23(k) (4) of the Code. These payments having been made by petitioner in connection with his personal guaranty, we think they fall within the same category as the $70,000 payment made in 1941. Since we hold that the 1941 payment constituted a loss sustained in a transaction entered into for profit under section 23 (e) (2) of the Code and was not properly deductible as a bad *292 debt, we make the same holding with respect to the 1942 and 1943 payments. We therefore conclude that the respondent erroneously determined such payments to constitute bad debt deductions in those respective years. Decision will be entered under Rule 50.